Melanie F. **COLLINS**, Plaintiff,

v.

The **UNITED STATES**, Defendant.

No. 521–87C.

United States Claims Court.

Aug. 23, 1991.

---

William L. Bransford, Washington, D.C., atty. of record, for the plaintiff.

John S. Groat, Civ. Div., Dept. of Justice, Washington, D.C., with whom was the Asst. Atty. Gen., Civ. Div., attys. of record, for defendant.

## OPINION

HORN, Judge.

### SUMMARY

Plaintiff, a former United States Navy Lieutenant, brought this cause of action pursuant to 28 U.S.C. § 1491(a)(2) (Supp. I

1983), requesting relief pursuant to 10 U.S.C. § 1552(a) (Supp. I 1983).

In the complaint filed with the United States Claims Court, the plaintiff seeks an award as follows: reversal of several decisions of the Board for Correction of Naval Records (BCNR), correction of her official Naval record and removal of certain negative records from her official file, including a correction reflecting and supporting a promotion, with an award of backpay commensurate with the rank of Lieutenant Commander, and replacement of a Letter of Non–Attainment of Surface Warfare Officer Qualifications with a Letter of Attainment. In the alternative, the plaintiff requests reinstatement as a Lieutenant, with an award of backpay commensurate with that rank. Additionally, in this court, the plaintiff contends that the BCNR denied her due process of law when it issued its decision without a hearing, and before she could properly rebut its conclusions.

After review of the submissions filed by the parties, including, the plaintiff's numerous, and sometimes overlapping, claims and arguments, and the defendant's responses, a careful reading of the record of the administrative proceedings and in consideration of the representations made to this court at oral argument, Defendant's Motion for Partial Dismissal and Motion for Summary Judgment are, hereby, GRANTED, and Plaintiff's Cross–Motion for Summary Judgment is, hereby, DENIED.

## BACKGROUND

Plaintiff, Lieutenant (LT) Melanie Collins, served as a commissioned officer in the United States Navy from January 2, 1978 until her discharge on August 3, 1987. Upon graduation from Surface Warfare Officer's school, plaintiff was assigned to duty aboard the USS POINT LOMA. During her tour of duty aboard the USS POINT LOMA, LT Collins worked towards qualifying as a Surface Warfare Officer (SWO).

During plaintiff's tour of duty aboard the USS POINT LOMA and pursuant to Military Personnel and Command Instructions (MILPERSCOMINST) 1611.1 §§ 2–7, 2–9, and 3–1 (May 12, 1981), two of plaintiff's superior officers issued five Officer Fitness Reports (OFRs) reviewing plaintiff's performance. Captain O'Shea, plaintiff's commanding officer, authored four reports covering the following time frames: May 28 through December 31, 1982; January 1 through June 30, 1983; July 1 through December 31, 1983; and January 1 through August 13, 1984. Additionally, Captain Maurer, the Commander of Submarine Development Group One, filed a "concurrent fitness report" covering January 1 through August 10, 1984.

During the time frame covered by these five reports, LT Collins appeared before three review boards. On November 15, 1983 and December 7, 1983, two separate panels convened to evaluate the plaintiff's qualifications for both Officer On Deck (OOD) and SWO. On December 9, 1983, Captain O'Shea, based on the two recommendations to deny plaintiff SWO qualifications, issued a "Letter of Non–Attainment of SWO Qualification," recommending that LT Collins be transferred to shore duty.

On April 23, 1984, a third review board, referred to as an advisory board, was convened at the request of Captain Maurer, the Commander of Submarine Group One. This advisory board's function was to determine whether LT Collins should be transferred to another ship in order to continue to seek SWO qualification. After reviewing the findings of the advisory board, Captain Maurer determined that LT Collins did not have the ability to qualify as an SWO, even in the future. As a result, Captain Maurer no longer considered reassigning the plaintiff to another tour of duty aboard a ship.

Subsequent to Captain Maurer's review of the April 23, 1984 advisory board recommendation, LT Collins informed Captain O'Shea that she had been sexually harassed by one of the members of the advisory board, Lieutenant Commander (LCDR) Hansen. Two separate investigations were undertaken by the defendant to consider LT Collins' charges against LCDR Hansen. On June 8, 1984, Captain O'Shea appointed

LCDR Keegan to head the ship's "in-house" investigation, which was conducted aboard the USS POINT LOMA. Once LT Collins formally filed a "Request for a Redress of Wrongs," pursuant to 10 U.S.C. § 938 (1982), the Judge Advocate for the General Counsel (JAGC) began its own independent review of LT Collins' allegations of sexual harassment. Both the final report of LCDR Keegan, issued on July 13, 1984, and the report issued by the JAGC on July 17, 1984, concluded that the allegations made by LT Collins were unsubstantiated by the available evidence. Furthermore, the JAGC report also concluded that Captain O'Shea's decisions "not to qualify LT Collins as a surface warfare officer and to submit the non-attainment letter are objectively reasonable and are not the product of sexual discrimination or harassment." On December 7, 1984, LT Collins filed an appeal to the JAGC report with the Secretary of the Navy. The Secretary of the Navy affirmed the JAGC's findings in a letter issued on March 5, 1985.

On November 12, 1985, LT Collins, pursuant to 10 U.S.C. § 1552 (Supp. I 1983), submitted two petitions to the Board for Correction of Naval Records (BCNR). One petition requested the removal of the numerous fitness reports. In the second petition, LT Collins requested the removal from her service record of the December 9, 1983 letter of non-attainment, and all documents pertaining to the results of the advisory board which was convened on April 23, 1984. To insure that the BCNR could issue a decision before May 12, 1986, when a selection board was scheduled to convene and consider LT Collins for a promotion, LT Collins requested expeditious consideration of her petitions.

Based on the information submitted to it for its review, the advisory opinion adopted by the BCNR concluded the following:

a. LT Collins was given every consideration in her quest for Surface Warfare Officer qualification;

b. LT Collins was treated fairly in her evaluations, both in fitness reports and SWO qualification boards;

c. LT Collins allegations of sexual harassment are unsubstantiated, following appropriate investigation.

d. LT Collins was not sexually discriminated against in her assignment or evaluation as a Naval Officer.

e. LT Collins' BCNR petition should not be granted.

On April 24, 1986, in response to her request for expeditious consideration, the BCNR sent a copy of an advisory opinion to LT Collins. The cover letter indicated that, although a petitioner normally has the option to file a rebuttal within thirty days, if more immediate action is required, the board can take final action prior to the expiration of that time. The letter specifically referred to reviews relating to imminent mandatory separation or consideration by a selection board for promotion as two common instances which might result in expedited action.

On May 9, 1986, the BCNR issued its final decision, which affirmed the findings of the April 24, 1986 advisory opinion. Because LT Collins' rebuttal to the advisory opinion (although dated May 9, 1986) was received by the BCNR on May 15, 1986, subsequent to the BCNR's final ruling, the BCNR treated the rebuttal as a request for reconsideration of the final decision. After reconsideration, and because the board found that the rebuttal failed to introduce any new information or issues, the BCNR denied the plaintiff's constructive request for reconsideration of the May 9, 1986 decision.

Finally, having been passed over for promotion to Lieutenant Commander during the May 12, 1986 selection board, and, for the second time, in May, 1987, LT Collins was involuntarily and honorably discharged from the Navy on August 3, 1987, as required by 10 U.S.C. § 632 (1982). Subsequently, the plaintiff filed the above-captioned case in this court to challenge the BCNR's proceedings and determinations.

In the complaint filed with this court, plaintiff seeks, either to be reinstated as an SWO with an award of backpay commensurate with the rank of Lieutenant Commander; or, if the court determines that it lacks

the jurisdiction to entertain such a request, reinstatement as a Lieutenant with an award of backpay commensurate with that rank. Defendant, in response to the complaint, has moved for a partial dismissal of the case and partial summary judgment. Defendant contends that this court lacks the jurisdiction to accord LT Collins a promotion, including backpay commensurate with that rank. Moreover, defendant contends that the BCNR properly exercised its discretion when it denied plaintiff's requests for relief and the defendant requests summary judgment in its favor.

### DISCUSSION

Defendant has filed a Partial Motion to Dismiss to address that portion of plaintiff's complaint requesting a promotion to LCDR and backpay, commensurate with that rank.

When deciding a motion to dismiss, which is based on a challenge to the jurisdiction of the court, the court must reach its decision based on the evidence presented to it by the parties. The Supreme Court has clearly articulated, and the United States Court of Appeals for the Federal Circuit has explicitly adopted, the general standard for how courts should weigh evidence presented in a complaint, when deciding a motion to dismiss, as follows:

> Moreover, it is well established that, in passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader.

*Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Hamlet v. United States*, 873 F.2d 1414, 1416 (Fed.Cir.1989).

The Court of Appeals for the Federal Circuit has indicated that if a motion to dismiss for lack of subject matter jurisdiction brings a challenge to the truth of the jurisdictional facts alleged in the complaint, the trial court may also consider relevant evidence in order to resolve disputed facts. *Reynolds v. Army & Air Force Exchange Service*, 846 F.2d 746, 747 (Fed.Cir.1988).

When the facts alleged in the plaintiffs' complaints are challenged, the burden is on the plaintiff to establish jurisdiction. *Burgess v. United States*, 20 Cl.Ct. 701, 703 (1990).

Even giving the plaintiff in this case every possible benefit of the doubt, the record does not support LT Collins' claim that she would have been entitled to a promotion. Assuming, however, for arguments sake, that LT Collins had been entitled to a promotion to the rank of LCDR, this court still should not grant her the relief she requests. The Constitution vests the power of appointment (and, therefore, also the authority to promote) in the appropriate military officials within the Executive branch of government, not in the Judicial branch. *Orloff v. Willoughby*, 345 U.S. 83, 90, 73 S.Ct. 534, 538–39, 97 L.Ed. 842 (1953); *Maier v. Orr*, 754 F.2d 973, *reh'g denied*, 758 F.2d 1578 (Fed.Cir.1985); *Goutos v. United States*, 552 F.2d 922, 212 Ct.Cl. 95 (1976).

The court also recognizes that judicial deference should be afforded, in this case to the Navy, when reviewing matters which impinge upon military affairs and national defense, absent explicit legislative guidance. In *Orloff v. Willoughby*, the Supreme Court stated:

> But judges are not given the task of running the Army. The responsibility for setting up channels through which ... grievances can be considered and fairly settled rests upon the Congress and upon the President of the United States and his subordinates. The military constitutes a specialized community governed by a separate discipline from that of the civilian. Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters.

*Orloff v. Willoughby*, 345 U.S. at 93–94, 73 S.Ct. at 540; *see also Rostker v. Goldberg*, 453 U.S. 57, 70–71, 101 S.Ct. 2646, 2654–55, 69 L.Ed.2d 478 (1981); *Dept. of Navy v. Egan*, 484 U.S. 518, 530, 108 S.Ct. 818, 825–26, 98 L.Ed.2d 918 (1988).

In the area of personnel matters, the court should allow the military the widest possible latitude in the administration of those personnel matters. *Sanders v. United States,* 594 F.2d 804, 813, 219 Ct.Cl. 285, 302 (1979); *Skinner v. United States,* 594 F.2d 824, 830, 219 Ct.Cl. 322, 332 (1979). No individual serviceman or servicewoman is entitled to a promotion. Promotions generally are awarded based on evaluations of an individual's performance by those in the military entrusted with that responsibility. In *Voge v. United States,* 844 F.2d 776, 782 (Fed.Cir.1988), *cert. denied,* 488 U.S. 941, 109 S.Ct. 365, 102 L.Ed.2d 355 (1988), the court wrote "[A]ccordingly, absent a statute or regulation entitling a service member to a promotion as a matter of law, the Claims Court has no authority to entertain this claim (citations omitted)." This court agrees.

Still remaining for the court's review, however, is LT Collins' alternative claim for correction of her military records and for reinstatement into the Navy at the rank of Lieutenant, with back pay commensurate to that rank. Plaintiff claims that the decision of the BCNR and the various review boards were each based on incorrect or biased information and, therefore, she now should prevail. The defendant responded by moving for summary judgment on this portion of the case.

The summary judgment procedure in the United States Claims Court is authorized by Rule 56 of the Rules of the United States Claims Court (RUSCC). Summary judgment is a method for disposing of all or parts of an action, if there are no material facts in dispute. The motions should present only legal issues for resolution.[1]

■ In cases such as the instant one, which challenge the decisions of the BCNR, absent unusual circumstances, the court's review is generally limited to the proceedings before the BCNR, the record developed by the BCNR and the findings of the BCNR. *See Long v. United States,* 12 Cl.Ct. 174, 175 (1987). Consequently, the parties agree that the record of the administrative proceedings, as filed, presents no facts in dispute and that the instant case is ripe for disposition by a motion for summary judgment.

■ Moreover, for this court to overturn the decisions of the BCNR, the plaintiff has the burden of proving by clear and convincing evidence that the BCNR acted arbitrarily and capriciously, in bad faith, without a rational basis, or based its decision on an erroneous fact, or is contrary to law, regulations or mandatory published procedure by which plaintiff has been seriously prejudiced and money is due. *Armstrong v. United States,* 205 Ct.Cl. 754, 761 (1974); *Curry v. United States,* 609 F.2d 980, 983, 221 Ct.Cl. 741, 746 (1979); *Wronke v. Marsh,* 787 F.2d 1569, 1576 (Fed.Cir.1986), *cert. denied,* 479 U.S. 853, 107 S.Ct. 188, 93 L.Ed.2d 121 (1986); *Sanders v. United States,* 594 F.2d at 811, 219 Ct.Cl. at 298; *Skinner,* 594 F.2d at 830, 219 Ct.Cl. at 333; *Guy v. United States,* 608 F.2d 867, 870, 221 Ct.Cl. 427, 433 (1979). Thus, as long as the record before the BCNR supports its findings and conclusions, the court should generally defer to the decision of the BCNR, which is entitled to the presumption that it properly exercised its discretion. This court should also defer to the findings of the BCNR because when it reviewed LT Collins' military record, it had the opportunity to observe the plaintiff's demeanor and make credibility determinations upon that basis. *See Hambsch v. Department of Treasury,* 796 F.2d 430, 436 (Fed.Cir. 1986) (stating that the presiding official's credibility determinations are "virtually unreviewable"). Beyond a mere showing of improper action by the BCNR, the plaintiff must also show that any error or injustice which may have occurred was to the detriment of the plaintiff. As stated in *Hary v. United States,* 618 F.2d 704, 709, 223 Ct.Cl. 10, 20 (1980), "Harmless error, unrelated to an officer's nonselections, will not warrant judicial relief.".

*Massaro, Inc. v. United States,* 17 Cl.Ct. 67, 70 (1989).

---

**1.** Since RUSCC 56(c) is closely patterned upon FRCP 56(c), precedent under the FRCP is relevant to interpreting RUSCC 56(c). *Lichtefeld-*

■ Moreover, when contesting particular personnel actions taken by members of the Armed Forces, a plaintiff must overcome the "strong but rebuttable presumption that administrators of the military, like other public officers, discharge their duties correctly, lawfully, and in good faith." *Sanders v. United States*, 594 F.2d at 813, 219 Ct.Cl. at 302; *Guy v. United States*, 608 F.2d at 870, 221 Ct.Cl. at 433; *Hary v. United States*, 618 F.2d at 704, 223 Ct.Cl. at 17 (1980). Thus, in order to prevail, the plaintiff in the instant case would have to demonstrate from the record that those officials who ruled on plaintiff's status while she was a member of the armed forces violated the applicable standards of law or acted arbitrarily, capriciously, in bad faith or without a rational basis.

## PLAINTIFF'S FIRST PETITION BEFORE THE BCNR

The plaintiff challenges the Officer Efficiency Reports included in her record. To be sure, each officer's fitness report (OFR) is a vital document in that officer's military career. During an officer's service in the military, OFRs serve as an important gauge for monitoring the officer's performance and progression, as well as for determining whether an officer should be considered for promotion.[2] In this context, the court appreciates the need to insure that an officer's record is portrayed in "fair and equitable terms." *Sanders*, 594 F.2d at 814, 219 Ct.Cl. at 302; *See Hary v. United States*, 618 F.2d at 709, 223 Ct.Cl. at 19.

This court's predecessor, the United States Court of Claims, found specific examples of when an officer's record was not being portrayed fairly as, among others,

inclusion in the report of factors which "had no business being in the rating process," *Guy*, 608 F.2d at 871, 221 Ct.Cl. at 433; "misstatement of a significant hard fact," *Hary*, 618 F.2d at 708, 223 Ct.Cl. at 17; and when the preparation of the request violated an applicable statute or regulation, such as failing to supply dissenting comments in violation of applicable Air Force regulations, *see Guy*, 608 F.2d at 870, 221 Ct.Cl. at 432; *Hary*, 618 F.2d at 708, 223 Ct.Cl. at 17.

In view of the numerous, and sometimes overlapping, challenges brought by the plaintiff concerning the various OFRs in her record, the court will attempt to review each OFR and to consider plaintiff's respective challenges to each report separately, considering, among other factors, whether each report was a fair and equitable evaluation of LT Collins' record.

a. *The January 1, 1983—June 30, 1983 Special Report*

With respect to the Special Report issued by Captain O'Shea, which covers plaintiff's career as an officer from January 1, 1983 thru June 30, 1983, LT Collins asserts four claims regarding the report's validity. Plaintiff's first allegation is that her Commanding Officer improperly issued the report as a Special Report and that its contents should have been incorporated into a regular report.[3]

Based on the action taken by the BCNR on April 23, 1986, it appears that the report's mislabelling was an error. Once the error was identified, corrective action was taken and the report was relabelled a "regular fitness report," prior to the May 12, 1986 selection board. Because the report

---

2. Naval Military Personnel Communication Instruction (NAVMILPERSCOMINST) 1611.1 § 2–1 (May 12, 1981) states:

Reports on the fitness of officers are an objective appraisal of their performance, as documented by their reporting seniors.... Fitness reports are the principal document in an officer's record and are the primary basis of comparing and selecting officers for promotion, assignment, selection for command, and professional training. Realistic objective evaluations of individual officers are essential to the accomplishment of each of these tasks.

3. NAVMILPERSCOMINST 1611.1 §§ 2–7 and 3–1 (May 12, 1981) require that the commanding officer prepare regular fitness reports annually.

NAVMILPERSCOMINST 1611.1 § 2–11 (February 3, 1987) permits the issuance of a special report under the following instances: a) when the officer is assigned to a new reporting senior; b) when a naval reserve officer is eligible for promotion; c) when an officer is guilty of serious misconduct or marked inefficiency. Such a report, however, is required when confirming an officer's illegal use or possession of drugs.

contained information favorable to the plaintiff, it would have been to LT Collins' detriment to remove the report prior to the May 1986 selection board meeting. Moreover, since the BCNR used a corrected report in their considerations, LT Collins was not prejudiced by the mistake, and it, therefore, may be considered a harmless, procedural error.

■ Plaintiff also contends that the report makes improper references to an earlier report which the BCNR excised from her record. These references, according to plaintiff, violated the Board's recommendations, which cautioned against future references to the excised report in subsequent reports.[4] While the report does make passing references to the earlier excised report, the bulk of the report independently assesses her progress during the subsequent six-month period. Even if the report improperly alludes to the earlier excised report, the failure to remove it from plaintiff's record, however, was not prejudicial, especially since the report at issue is one of the more positive reviews of plaintiff's military service and presented plaintiff in a favorable light before the selection board.[5] Furthermore, LT Collins' military record is replete with evidence which, otherwise, supports the BCNR's adverse, final decision to uphold plaintiff's discharge from the Navy. The inclusion of the relabelled report in her file, therefore, was not pivotal to the BCNR's adverse decision. *See Guy,* 608 F.2d 867 at 870, 221 Ct.Cl. at 432.

■ Additionally, LT Collins claims that Captain O'Shea's choice of the grades he assigned to her performance were not commensurate with the positive comments she had received. Based on these allegations, LT Collins is questioning her superior's assessment of her performance, considera-

tions which go beyond the document itself. In such instances, the United States Court of Claims has refrained from changing the substance of the report. Rather, it has accorded the rater great deference in his/her evaluation of subordinate service members. *See In re Savio v. United States,* 553 F.2d 105, 213 Ct.Cl. 737 (1977); *Hary,* 618 F.2d at 708, 223 Ct.Cl. at 17–18. Even in cases when a rater has omitted pertinent information and realized that he failed to scrutinize the plaintiff's performance fairly, as in *Savio,* 553 F.2d 105, 213 Ct.Cl. at 737 (1977), the court has refused to excise the contested reports. *See Hary,* 618 F.2d at 708, 223 Ct.Cl. at 18. Absent clear evidence of bias or improper consideration of the report, this court, however, should refrain from second guessing the propriety of the BCNR's decision. The court should not try to analyze the extent to which the BCNR considered the grades assigned by Captain O'Shea to LT Collins in the January 1, 1983—June 30, 1983 report in reaching its final conclusion, especially if the balance of the evidence included in the record before the BCNR supports the Board's ultimate conclusions, as in the instant case.

Plaintiff's final contention before this court, although not posed for the Board, with respect to this same report is that she did not receive proper training and counseling. According to LT Collins, these shortcomings undermine the report's probative value when the BCNR considered her case on review. Plaintiff's challenge to the training and guidance offered by the Navy, however, is not relevant to the accuracy of the report. Moreover, there is, in the stipulated record, much evidence which the BCNR had before it when it conducted its review to indicate that LT Collins was ade-

---

4. In the BCNR January 17, 1984 review concerning the earlier excised report, the BCNR recommended that:

> any material or entries inconsistent with or relating to the Board's recommendation be corrected, removed or completely expunged from Petitioner's record and that no such entries or material be added to her record in the future.

5. In the Officer Fitness Report for January 1, 1983 to June 30, 1983, LT Collins' commanding officer, Captain O'Shea, noted that LT Collins demonstrated her effectiveness as an officer in various instances. Based on her accomplishments, the Commanding Officer concluded that "LT Collins has developed herself into an asset to the USS POINT LOMA. I look forward to continued personal and professional association with this young officer. LT Collins is recommended for promotion to LCDR."

quately trained by the Navy.[6] Additionally, there is ample evidence to indicate that it was LT Collins' own lack of motivation and failure to develop a working knowledge of her responsibilities which cost her the SWO qualification and the rank of Lieutenant Commander.[7]

**6.** Captain Maurer, in his January 29, 1986 memo to the BCNR advisory board, stated that "Lieutenant Collins was extensively counseled by senior officers on [his] staff, and [he] personally reviewed the results of those sessions with the officers concerned. In addition, [he] personally counseled LT Collins on the steps she needed to take to continue her pursuit of the Surface Warfare Qualification." *COLLINS, MELANIE F., LT, USN, 156–48–5866*, memorandum from Commander, Submarine Development Group 1, San Diego to Commander, Naval Military Personnel Command (NMPC–32) (January 29, 1986).

LCDR Switzer, in his December 3, 1984 report regarding LT Collins "Complaint of Wrongs" concluded that "LT Collins was counseled by the Chief Staff Officer (Captain Maurer) and provided ample time and opportunity to train." *ARTICLE 138, UCMJ, COMPLAINT OF WRONGS IN THE CASE OF LT MELANIE F. COLLINS, USN, 156–48–5866/1160*, Memorandum from LCDR D.R. Switzer, JAGC, USN, to Commander Submarine Force, U.S. Pacific Fleet Representative West Coast at 3 (December 3, 1984).

Several interviews conducted by LCDR Switzer, and included in his December 3, 1984 report, supported this conclusion:

(1) LT Lewandowski indicated that "many, many people spent numerous hours with (LT Collins)." Unsworn Statement of LT Linda Lewandowski, USN, Commander Submarine Group Five (November 28, 1984).

(2) LT Harris noted that "the command bent over backwards to qualify all (women)." Unsworn Statement of LT Constance J. Harris, USN, Commander Naval Military Personnel Command (N-16), made to LCDR D.R. Switzer, JAGC, USN, Commander Submarine Group Five (November 27, 1984).

(3) LT Carson concluded that "(the command) bent over backwards to help (LT Collins)…. They sent extra officers up on deck to help (LT Collins) with watches." Unsworn Statement of LT Laurie Carson, USN, OPNAVSUPPACT, Washington, D.C., made to LCDR D.R. Switzer, JAGC, USN, Commander Submarine Group Five (November 28, 1984).

**7.** LCDR Switzer, in his December 3, 1984 report, believed that LT Collins' chief weakness was "the lack of understanding of basic principles and the lack of motivation necessary to ask the appropriate questions of others necessary to gain the proper understanding of these principles." *ARTICLE 138, UCMJ, COMPLAINT OF WRONGS IN THE CASE OF LT MELANIE F. COLLINS, USN, 156–48–5866/1160*, Memorandum from LCDR D.R. Switzer, JAGC, USN, to Commander, Submarine Force, U.S. Pacific Fleet Representative West Coast at 3 (December 3, 1984).

Other individuals whom LCDR Switzer interviewed referred to this shortcoming as well:

(1) LT Sarles "felt uncomfortable standing watch with (LT Collins). (LT Collins) was an ineffective, uncertain Officer on Deck (OOD). At worst, she was dangerous, at best, she was not responsive." Unsworn Statement of LT Kathleen M. Sarles, SC USN, made to LCDR D.R. Switzer, JAGC, USN, Commander, Submarine Group Five (November 29, 1984).

(2) LT Lane recalled that "(LT Collins) was insecure and lacked confidence. When working for her, (LT Lane) received little guidance—perhaps due to (LT Collins') lack of knowledge." Unsworn Statement of LT Diane Lane, USN, USS POINT LOMA, made to LCDR D.R. Switzer, JAGC, USN, Commander Submarine Group Five (December 3, 1984).

(3) LT Lewanowski stated that "administratively, there were a lot of things (LT Collins) forgot or failed to do. As OOD, she had a hard time making decisions…. She'd have to turn to others for guidance. She was unable to assess the situation and act … In my opinion, she lacked the initiative." Unsworn Statement of LT Linda Lewandowski, USN, USS POINT LOMA, made to LCDR D.R. Switzer, JAGC, USN, Commander Submarine Group Five (November 28, 1984).

(4) LT Harris commented that "(LT Collins) was incompetent at managing the department…. My general impression is that she was a very poor OOD and a poor leader…. She had a rote memory but she couldn't analyze. She couldn't visualize situations on the bridge especially and predict the future outcome…. In my opinion, LT Collins didn't spend the time it took to qualify." Unsworn Statement of LT Constance Harris, USN, Commander Naval Military Personnel Command (N-16), made to LCDR D.R. Switzer, JAGC, USN, Commander Group Five (November 27, 1984).

(5) Furthermore, LCDR Killion, in issuing the April 23, 1984 advisory report for Captain Maurer, indicated that all members of the panel noted "LT Collins' lack of self confidence." *QUALIFICATION BOARD ICO LT M. COLLINS*, Memorandum from CDR R.A. Killion, USN, to Commander Submarine Development Group One, ¶ 3 (April 23, 1984).

Similarly, LT Hopkins, in her report to Captain O'Shea regarding the December 7, 1983 OOD and SWO qualification review board, reported:

… the consensus of the board was that LT Collins' answers were the product of rote memorization and contained little evidence of comprehension of 'Big Picture.' The real feeling of the board members is a lack of confidence in LT Collins's judgment and ability to react under stress.

b. *The July 1, 1983 through December 31, 1983 Regular Report*

 With respect to the July 1, 1983—December 31, 1983 Regular Report, LT Collins challenges the validity of this report for five reasons: First, LT Collins claims the report assesses her as an Operations Officer, a demanding position which required training beyond that which she had received to date. She, therefore, argues that the report was judging her by a much higher standard than contemplated by the Operations Naval Instruction (OPNA-VINST) 1412.2C (July 13, 1983).[8]

LT Collins' allegation does not challenge the accuracy of this report. Rather, her claim questions decisions regarding plaintiff's assignments and suitability for attaining SWO qualification. Despite plaintiff's reliance on OPNAVINST 1412.2C (July 13, 1983), that regulation does not delineate an appropriate position under which a candidate should be assessed for SWO qualification. The timing of an assessment for SWO qualifications and the grant of that level is a discretionary action, well within the powers of LT Collins' superiors. Since plaintiff cannot point to an explicit violation of a regulation, this court should not substitute its own judgment for that of the Navy, the military branch to which the SWO decision has been delegated. The courts owe deference to the executive branch agency, absent a clear showing of abuse. *See Orloff,* 345 U.S. at 93, 73 S.Ct. at 539–40. Judges are not assigned the task of running the military. *Voge v. United States,* 844 F.2d at 780 (absent a violation of a statute or regulation, the court lacks manageable standards by which to assess the propriety of military actions).

Therefore, in the instant case, this court should defer to the BCNR's decision not to excise this report.

 Second, concerning the July 1, 1983—December 31, 1983 regular report, LT Collins claims that the report inaccurately characterizes her motivation and initiative. LT Collins notes that she completed her SWO qualifications by the August 30, 1983 deadline set by her Commanding Officer. Furthermore, plaintiff contends that she rivaled or surpassed other SWO officers in her performance of various SWO qualification drills, for which proposition she cites copies of drill reports for other enlisted personnel contemporaneously seeking SWO qualification.

As noted earlier, it is this court's position that it should only change or excise a report under very limited circumstances, given the deference courts traditionally have accorded a rater's evaluation. There is nothing in the record before the court to suggest that Captain O'Shea's July 1, 1983—December 31, 1983 regular report is so biased or unfair as to compel this court to find that the BCNR acted improperly in failing to excise the report. Moreover, even if the record is of the kind which should not have been included in the plaintiff's record, as in *Savio,* 553 F.2d 105, 213 Ct.Cl. at 737, other evidence in this plaintiff's record, nonetheless, supports the BCNR's recommendation that the plaintiff was treated fairly, as in *Guy,* 608 F.2d at 872, 221 Ct.Cl. at 436, and *Hary,* 618 F.2d at 704, 223 Ct.Cl. at 10, and properly was subject to statutory discharge after receiving two unfavorable evaluations.

*OOD QUAL ICO LT COLLINS,* Senior Watch Officer (December 7, 1983).

In his July 1, 1983 to December 31, 1983 regular fitness report, Captain O'Shea attributed his issuance of a letter of non-attainment to SWO qualification with respect to LT Collins to "(LT Collins's) lack of motivation and inability to satisfactorily demonstrate leadership attributes and technical comprehension required of bridge watchstanders." *COLLINS, MELANIE F., LT, USN 156–42–5866,* Officer Fitness Report, July 1, 1983 to December 31, 1983.

Again in his January 1, 1984—August 13, 1984 regular fitness report, Captain O'Shea was dis-

mayed to report that "(LT Collins's) basic attitude, understanding of policy and procedures and *personal* acceptance of responsibility did not improve.... (LT Collins) must take charge of her professional life and correct aforementioned deficiencies in order for me to recommend her for promotion." *COLLINS, MELANIE F., LT, USN, 156–42–5866,* Officer Fitness Report, January 1, 1984 to August 10, 1984.

**8.** OPNAVINST 1412.2C (July 13, 1983) establishes the requirements for qualification and designation as a Surface Warfare Officer (SWO).

Third, LT Collins contends that her superiors supplied inadequate counseling and training in violation of OPNAVINST 1412.2C(5)(b) and (7)(b) (July 13, 1983).[9] First, plaintiff points to an evaluation issued on October 20, 1983, which stated that the USS POINT LOMA did not provide an organized OOD training program. Furthermore, plaintiff contends that the various memoranda apprising candidates of the time frames established for the completion of watch qualification milestones reveal a wide range of inconsistencies in qualification standards.

It appears that LT Collins may be able to demonstrate that her superiors did not establish a rigid training program for OOD qualification on the ship on which she was stationed. Plaintiff, however, has not brought to the attention of the court any statute or regulation which would require uniform OOD training opportunities. In *Voge*, 844 F.2d at 780, the court quoted the words of the Supreme Court that: "[T]he complex, subtle and professional decisions as to the composition, training, equipping and control of military force are essentially professional military judgments...." *Gilligan v. Morgan*, 413 U.S. 1, 10, 93 S.Ct. 2440, 2446, 37 L.Ed.2d 407 (1973). Consequently, this court should not intervene to second guess the manner in which the plaintiff's training was conducted.

Fourth, LT Collins also asserts that the report is improperly tainted by the two OOD and SWO qualification board results conducted in November and December 1983. To the extent that LT Collins' challenges to the proceedings of the November and December, 1983 boards discussed below incorporate procedural and substantive allegations already discussed, they are incorporated here. Consequently, despite plaintiff's allegations that the report is improperly tainted by the OOD and SWO qualification board results conducted in November and December, 1983, the record is replete with independent evidence that the decisions of the BCNR in plaintiff's case were justified and within the law.

Finally, plaintiff claims that the July 1, 1983—December 31, 1983 regular report is tainted by improper bias, in violation of NAVMILPERSCOMINST 1611.1 § 2–1 (May 12, 1981).[10] Based on a memorandum LT Hopkins sent to Captain O'Shea, LT Collins alleges that Captain O'Shea's perception of her ability was improperly colored and biased. LT Collins asserts that LT Hopkins, a superior, harbored a strong and negative bias toward her. Regardless of the tone of LT Hopkins' memorandum and the possible prejudicial impact it may have had on Captain O'Shea's evaluation of LT Collins, the memorandum underscores shortcomings in LT Collins' performance also clearly emphasized elsewhere in the record.[11] Therefore,

---

**9.** OPNAVINST 1412.2C(5)(b) (July 13, 1983) states that "[c]ommanding officers are encouraged to use every opportunity (e.g., officer exchange programs, TAD assignments, trainer facilities, formal training) to provide exposure to all aspects of surface warfare."

OPNAVINST 1412.2C(7)(b) (July 13, 1983) notes that "[i]n the interest of maintaining consistent standards for qualification, Immediate Superiors in Command (ISICs) are directed to ensure that the spirit and intent of this instruction are being followed by units in their command. This should be accomplished by monitoring and evaluating qualifiers and qualification programs." *Id.*

**10.** *See supra* note 2.

**11.** LT Hopkins, in her December 23, 1983 memorandum to Captain O'Shea, criticized LT Collins' performance during her sixteen-month tour of duty.

(1) LT Hopkins contends that LT Collins failed to "take any noticeable initiative in learning the necessary elements of (her various assignments)."
(2) LT Hopkins recounts "giv(ing) LT Collins time off the watchbill for CIC and eng(ineering) PQS time."
(3) Thus, "(LT Collins's) whole total expressed and demonstrated lack of comprehension of how this ship operates appall(ed) (her)."
(4) LT Hopkins noted that "(others didn't) want to relieve (LT Collins) because of the disorganized condition of the watch."
(5) On the same note, LT Collins' failure to "understand the (instrumentation) or ... make a simple decision to change course to get on track, (led crew members not to) trust her judgment or watchstanding."
(6) In sum, LT Collins' failure to appreciate that "it (was) her responsibility to qualify—and not (LCDR Hopkins's)" evinced "(LT Collins's) lack of perception of and sensitivity to her surroundings."

it would appear to this court that the BCNR did not act improperly in refusing to excise this report.

### c. *The Two January 1, 1984 through August 1984 Concurrent Reports*

█ With respect to the two June 1, 1984—August 1984 concurrent reports issued by Captains O'Shea and Maurer, LT Collins raises three arguments in support of her position that these reports should also be erased from her record. First, LT Collins contends she received inadequate training. Particularly, LT Collins refers to the chilling effect Senior Watch Officer LCDR Hansen had on her ability to gain counseling. Once she refused to submit to his sexual advances, LT Collins claims that LT Hansen refused to coach her in preparation for her appearance before the April 23, 1984 advisory board. Second, LT Collins asserts that the two concurrent reports are tainted by the erroneous and unjust results of the April 23, 1984 advisory board.[12]

LT Collins' allegation of sexual harassment is, again, an attempt to underscore her contention that she was improperly trained. Such an allegation fails to address the BCNR's decision with respect to the validity of the fitness report. Regardless of how LT Hansen treated plaintiff, the record suggests that superiors, other than LT Hansen, afforded her numerous opportunities to seek guidance and training.[13] Based on the record, LT Collins' failure to qualify as a SWO or to earn the rank of Lieutenant Commander was, in fact, due to her own shortcomings.[14] Moreover, the record does not support a conclusion that LT Collins was sexually harassed by LT Hansen.

Finally, LT Collins claims that the concurrent reports are tainted by improper biases. LT Collins claims that Captains O'Shea and Maurer used these two reports as retaliatory measures in response to her filing sexual harassment complaints during June of 1984. LT Collins, therefore, claims that these reports are laced with subjective and biased language in violation of NAVMILCOMINST 1611.1 § 2–1.[15]

LT Collins' claim that the reports violate NAVMILPERSCOMINST 1611.1 § 2–1 (May 12, 1981) is unfounded. References to her failure to assume responsibility for qualifying as an SWO reflect assessments of LT Collins' motivation and sense of commitment, areas described in her record as weak by the reviewing officials.[16] Furthermore, these comments underscore two separate opinions of her superiors regarding LT Collins' failure to appreciate that it was her responsibility to qualify, as the plain language of OPNAVINST 1412.2C(3) (July 13, 1983) states.[17]

In light of LT Collins' failure to demonstrate that her records are tainted by judicially cognizable defects, this court will not order removal of the fitness reports from her record. To the extent that her challenges question related Naval policies, LT Collins has failed to submit sufficient evidence that there has been a direct violation of any regulation. Absent such a showing, this court should not intervene in decisions assigned to the discretion of the military. Furthermore, the record documents that LT Collins' own behavior and weaknesses were the prime causes for her unfavorable ratings and reviews. Therefore, this court finds that the BCNR did not abuse its discretion in denying her first petition.

12. Plaintiff's allegation that the "two concurrent reports" are improperly tainted by the recommendations of the November and December 1983 OOD and SWO qualification boards ultimately calls into question the decision reached at these two boards. Since plaintiff, in her second petition filed with the BCNR directly challenges these boards' functions, the court has assessed the merits of arguments when reviewing the BCNR's action on LT Collins' second petition.

13. *See supra* note 6.

14. *See supra* note 7.

15. *See supra* note 7 and note 2.

16. *See supra* note 7.

17. OPNAVINST 1412.2C(3) (July 13, 1983) notes that "Surface Warfare Officer qualification is the direct responsibility of every surface warfare trainee."

PLAINTIFF'S SECOND PETITION BEFORE THE BCNR

In her second petition to the BCNR, plaintiff repeats many of the same allegations she used in her first petition to the BCNR, which were discussed above. This time plaintiff tries to use the allegations to request the court to order that the board erred, and that contrary to the board's rejection of plaintiff's request, her records should be corrected to grant her qualification as an SWO.

a. *December 9, 1983 Letter of Non–Attainment*

 LT Collins requests that this court excise from her service record the letter of non-attainment, dated December 9, 1983. Plaintiff contends that the letter of non-attainment should be excised because it is improperly tainted by the recommendations of two OOD and SWO qualification boards convened in November 1983 and December 1983. Plaintiff contends that OPNAVINST 1412.2C(5)(f) (July 13, 1983) states that a candidate's knowledge should be the measure for whether or not the individual qualifies for SWO. According to plaintiff, however, she was measured not on her knowledge but on "a variety of inappropriate standards of judgment" in violation of OPNAVINST 1412.2C.[18] Moreover, to support her right to OOD and SWO qualification, LT Collins contends that by granting board review to her, the Navy had already found that she had satisfied the prerequisites to qualify, set out in OPNAVINST 1412.2C(5) (July 13, 1983). As a result, plaintiff states that it was improper for these two qualification boards to undermine this estimation by denying her qualification.[19]

According to the record, however, the November and December 1983 qualification boards predicated their unfavorable decision on plaintiff's lack of substantive knowledge and skill which they deemed necessary to qualify as an SWO, as demonstrated by plaintiff's oral presentation, including her failure to respond intelligently or decisively. Her performance during both reviews demonstrated to those present that she did not possess the required in-depth working knowledge of the material.[20] Even after her second appearance before the December 1983 qualification board, members who had also sat on the November 1983 qualification board panel still found that plaintiff possessed only a limited knowledge of the required responsibilities and duties. In particular, these panelists noted that the breadth of LT Collins' knowledge was constrained to those examples and scenarios specifically elucidated in her study aides.[21]

18. OPNAVINST 1412.2C(5)(f) mandates that an SWO candidate:

> [a]fter satisfying the requirements in subparagraphs a-e: display a general professional knowledge of all aspects of surface warfare covered in SWO PQS during an oral examination by the commanding officer. The commanding officer will emphasize SWO PQS *Watchstations* which relate to his/her own ship ... The commanding officer shall normally conduct the oral examination while chairing a multi-member board composed of other qualified, experienced Surface Warfare Officers.

19. OPNAVINST 1412.2C(5) (July 13, 1983) requires that a candidate fulfill the following prerequisites before an oral examination: a) be assigned for permanent duty aboard a commissioned ship; b) satisfactorily complete all *System* and *Fundamental* items, and all applicable *Watchstation* items; c) qualify and serve successfully as a Combat Information Center Watch Officer; d) qualify and serve successfully as Officer of the Deck; and e) demonstrate effective leadership and management skills.

20. LT Hopkins, during the November qualification board review, noted that: "LT Collins was at an almost complete loss as to initial actions, or analyzing possible consequences, showed very little evidence of ever having considered those situations." *COLLINS, MELANIE F., LT, Oral Examination Record,* LT Hopkins interviewer (November 15, 1983).

LT Atkins, during the same qualification board review, remarked that LT Collins "is unable to answer a what if question. [LT Collins] [s]till needs to understand [the USS Point Loma's] plant layout." COLLINS, MELANIE F., LT, *Oral Examination Record,* LT Atkins interviewer (November 15, 1983).

LT Polio, similarly, concluded that LT Collins was "very weak in all areas." COLLINS, MELANIE F., LT., *Oral Examination Record,* LT Polio interviewer (November 15, 1983).

21. In summarizing the December qualification board's findings, LT Hopkins concluded that LT

Furthermore, the inferences and conclusions LT Collins draws from merely having an opportunity to appear before such qualification boards are untenable. If completion of the initial OOD and SWO prerequisites were to suffice to qualify a candidate, then there would be no need to hold an oral examination. It is clear that the Navy seeks to ensure that trainees who can more easily satisfy the earlier SWO prerequisites can also pass an oral examination and demonstrate the breadth and width of knowledge necessary to receive a final recommendation to qualify. The oral examination is a reasonable method of assessing whether a candidate can demonstrate to qualified officers the applicant's abilities and competence, prior to approval for the qualification.

LT Collins also challenges the composition of the two qualification boards. First, LT Collins objects to LT Hopkins' presence on both panels. LT Collins alleges that LT Hopkins felt serious animosity towards her, as reflected in a memorandum sent to Captain O'Shea.[22] Consequently, plaintiff contends that it was impossible for LT Hopkins to review LT Collins impartially. Secondly, LT Collins claims that the December 1983 qualification board was not composed of senior SWOs or the Commanding Officer, as she alleges OPNAVINST 1412.2C(5)(f) (July 13, 1983) requires. Instead, LT Collins asserts that she was solely judged by her peers.

■ The challenges which LT Collins makes to the seating of the qualification boards are unpersuasive. LT Collins has offered no corroborative evidence to show that she was being unfairly scrutinized by LT Hopkins. In fact, LT Hopkins' memorandum, despite its tone, highlights weaknesses in LT Collins' performance which

are underscored elsewhere in the record.[23] Furthermore, OPNAVINST 1412.2C(5)(f) does not require the presence of senior SWO officers, other than the Commanding Officer, on such boards. Rather, the regulation notes "that the commanding officer shall normally conduct the oral exam while chairing a multi-member board composed of other qualified, experienced Surface Warfare Officers." OPNAVINST 1412.-2C(5)(f). It would appear that Captain O'Shea did not violate the regulation in empaneling either the November 1983 or the December 1983 qualification boards.

■ Moreover, LT Collins failed to raise an objection to the personnel composition of the SWO board before the BCNR and, therefore, has waived any objection to such composition. This is especially true because plaintiff previously chose to have the BCNR extensively examine her assertions of improper proceedings in her record. *In re Doyle*, 220 Ct.Cl. 326, 609 F.2d 990 (1979), *cert. denied*, 446 U.S. 982, 100 S.Ct. 2961, 64 L.Ed.2d 837 (1980).

■ Thirdly, LT Collins contends that the qualification boards applied inconsistent standards in reviewing her qualifications, in violation of OPNAVINST 1412.-2C(7)(b) (July 13, 1983).[24] LT Collins notes that the USS POINT LOMA did not formulate minimum standards for SWO qualification. To try to underscore her argument, that the absence of standards led to inconsistencies, LT Collins offers the court the following examples: at least five individuals who failed to complete their Personal Qualification Standards (PQS) Watch Qualification Milestones by the expected dates eventually received SWO qualification, and that other candidates who displayed weak-

---

Collins' answers "were the product of rote memorization and contained little evidence of comprehension of the 'big picture'; all members agreed that [her] academic knowledge was adequate.... The real feeling of the board members is a lack of confidence in LT Collins' judgment and ability to react under stress." COLLINS, MELANIE F., LT, *Memorandum; OOD QUAL ICO LT COLLINS*, (December 7, 1983).

LT Polio, in his attached comments, was left with the impression that "[LT Collins's] answers

seem to be from memory." COLLINS, MELANIE F., LT, *Oral Examination Record*, LT Polio interviewer (December 7, 1983).

22. *See supra* note 11 summarizing the memo's content.

23. *See supra* note 7.

24. *See supra* note 9 (providing the regulation).

nesses while serving as OOD eventually qualified. In contrast, LT Collins notes that she timely completed her milestones and, although she displayed similar weakness to the aforementioned candidates while serving as OOD, she was not accorded SWO qualification. Given these similarities between herself and these other candidates, LT Collins claims that it was improper for the qualification boards not to accord her the OOD and SWO qualifications.

Whereas, other candidates may have evidenced similar shortcomings and weaknesses as LT Collins initially, each candidate is reviewed on his or her own individual record. Moreover, the record presents no evidence, and the court has before it only the plaintiff's allegations that other candidates may have also evidenced shortcomings in their history. Without further information, this court cannot even know whether or not the other candidates, perhaps, overcame their deficiencies by the time they appeared before their review board. Furthermore, to the extent that LT Collins may have felt hampered by the failure of her superiors to establish an organized SWO training program, it still remains the individual officer's responsibility to prepare herself to qualify for and pass review. Therefore, once again, the court must respect the BCNR's determination regarding the discretionary decisions made by the Navy regarding who should be awarded OOD or SWO qualification.

Lastly, LT Collins contends that her superiors provided preferential guidance and training for male candidates preparing for SWO qualification. Such a bias, LT Collins contends discriminates against the ability of a female to qualify as an SWO. Contrary to her contention, the record before the BCNR appears to suggest that Naval personnel extended every effort to qualify women as SWO's.[25]

b. *Findings of April 23, 1984 Advisory Board*

██ LT Collins also seeks to invalidate the findings of the April 23, 1984 advisory board empaneled by Captain Maurer. First, LT Collins claims that she was the victim of sexual harassment and discrimination. According to LT Collins, LCDR Hansen, her senior watch officer, refused to provide her with any guidance and training in preparation for her appearance before the April 23, 1984 advisory board in light of her refusal to submit to his sexual advances. As a result, LT Collins contends that she could not adequately prepare for her examination. In this context, LT Collins also asserts that LCDR Hansen's pres-

---

**25.** Captain Tompkins, in his advisory opinion to the BCNR:

"[r]ecognized that LT Collins volunteered for an assignment aboard a ship at point in her career different than a typical Surface Warfare Officer[.] [Nonetheless, her assignment aboard the USS Point Loma] is by no means a discriminatory policy. Many male candidates seek SWO qualification at similar career points.... There are many ... cases of males and females satisfactorily achieving SWO qualification after their initial junior officer assignments."

Many of the lieutenants interviewed by LCDR Switzer also indicated that they did not sense that the Navy discriminated against women.

(1) LT Sarles conceded that she believed "that the atmosphere around the command made it harder for a female to qualify than for a male in the same position." Nonetheless, she attributed LT Collins' inability to qualify as an SWO on LT Collins' inability to act as an "effective department head."

(2) LT Lane "didn't believe that there is any bias against women.... LT Collins is the only person who didn't get qualified and that was not because she is a woman." Unsworn Statement of LT Diane Lane, USN, US POint Loma, made to LCDR D.R. Switzer, JAGC, USN, Commander of Submarine Group Five (December 3, 1984). (App. pg. 265) In fact, LT Lane stated: "I am a woman. In the two years that I have been on board, only women have attempted to qualify for SWO. I don't believe there is any bias against women.... LT Collins is the only person who didn't get qualified and that was not because she was a woman.... She would get overwrought on the bridge and at times was near panic. Even during daily work routine she demonstrated uncontrollable rage at times.... She was insecure and lacked confidence."

(3) Similarly, LT Harris did not sense that LT Collins was the victim of discrimination either. "It was harder [to qualify] because I was a woman. I had no real experience with guns or missiles. On board [the] USS Point Loma, however, I received great help. The command had no bias against women." Unsworn Statement of LT Constance J. Harris, USN, Commander Naval Personnel Command (N–16), made to LCDR D.R. Switzer, JAGC, USN, Commander Submarine Group Five (November 27, 1983).

ence on the review panel not only intimidated her, but provided him with an opportunity to retaliate, given her refusals to accept his alleged sexual advances.

LT Collins, however, has been unable to substantiate her claim of sexual harassment. In support of her allegations, LT Collins has only supplied the sworn statement of a fellow officer. The document, however, only confirms that the plaintiff had alleged to the affiant that LCDR Hansen sexually harassed her.[26]

Second, LT Collins claims that two investigations undertaken by her superior, Captain O'Shea, and the JAGC to review her claims of sexual discrimination were at best cursory and inadequate. With respect to the two investigations which Naval officials undertook to investigate plaintiff's sexual harassment claim, the record suggests that LT Collins' superior properly and effectively considered LT Collins' claims. Pursuant to SECNAVINST 5350.6B § 101 (September 5, 1973), Captain O'Shea did order a prompt and independent investigation.[27] LCDR Keegan, in his report dated July 13, 1984, to Captain O'Shea, noted that, in light of the lapse in time between the filing of the complaint and the alleged harassment, he could not conduct an "ideal" investigation. Nonetheless, based on his inquiry, he could conclude with certainty that LT Collins' claim lacked merit. Upon reviewing this report, Captain O'Shea concurred with LCDR Keegan's findings.

In addition, the JAGC conducted its own independent inquiry. LCDR Switzer also was unable to locate any evidence to corroborate LT Collins' claim and concurred with LCDR Keegan's findings. Captain Switzer found, based on his investigation, that:

(1) five female officers attempted to qualify as SWO on USS POINT LOMA during Captain O'Shea's tenure as Commanding Officer, and all but LT Collins succeeded in the time allotted; (2) that the SWO qualification program aboard USS POINT LOMA was established in substantial compliance with applicable directives; (3) that LT Collins's fitness report for the period January 1, 1983, to June 30, 1983, is not an adverse report, but other, adverse fitness reports accurately describe her performance; (4) that Captain O'Shea verbally counseled LT Collins, subsequent to July 1, 1983, that her OOD (Underway) watchstanding was unsatisfactory; (5) that there was no evidence of sexual harassment by Lieutenant Commander Hansen other than Lt. Collins's uncorroborated allegations; and (6) that Captain O'Shea's decision to submit the non-attainment of SWO qualification letter to NMPC was completely unrelated to LT Collins's claim of sexual harassment.

Based on the record, the BCNR affirmed the finding of no sexual harassment or discrimination and turned down plaintiff's request for relief.[28]

Third, LT Collins claims that LCDR Killion, a member of the April 23, 1984 adviso-

---

26. Plaintiff supplied an affidavit signed by LCDR Carl Schuster, USN, who recalled a telephone conversation on March 3, 1984 in which LT Collins revealed that LCDR Hansen was "trying to negotiate a[n] affair" with her.

27. SECNAVINST 5350.6B (September 5, 1973) sets out the Navy's policy regarding equal opportunity and treatment for military personnel. Section 101 (Discrimination Complaints) requires that the following actions be taken:

1. The commander shall ensure that all personnel attached to the command are aware that he personally and the command structure are receptive to legitimate complaints of discrimination.

2. The commander shall ensure that complaints are effectively investigated, reviewed

and acted upon. A prompt investigation should be conducted by an individual not directly involved in the incident, with an independent review of the investigation. If the allegations in the complaint are found to be accurate, prompt corrective action must be taken.

3. The commander must make it clear to his personnel that filing a complaint of discriminatory treatment places them in no danger of reprisal, either by their immediate superiors or by the commander.

28. Captain Tompkins, in his advisory opinion to the BCNR, noted that LT Collins' return visits to LCDR Hansen after the alleged incidents detracted from her credibility.

ry board, made comments which plaintiff claims constituted *prima facie* evidence of sexual discrimination. LT Collins claims that LCDR Killion trivialized the importance of attaining SWO classification and indicated that it was unusual for women to seek such a rank. LT Collins alleges that such comments contravene the spirit of Secretary of Navy Instruction (SECNA-VINST) 5350.6B (September 5, 1973), a directive which seeks to insure equal opportunity and employment for military personnel.

LT Collins' contentions, however, are unsupported. The record, in fact, suggests that she was not the victim of gender discrimination.[29] In the first place, the timing of the alleged sexual harassment, in late February or early March, places the alleged offensive behavior after plaintiff had already failed her two SWO board appearances. Moreover, Captain Maurer did not have the authority to designate plaintiff an SWO. Captain Maurer's only purpose in considering a ship transfer was to ascertain whether or not to transfer the plaintiff in order to give her more shipboard experiences and, therefore, another possible opportunity to qualify for SWO. As the final arbitrator on the propriety of transferring LT Collins from the USS POINT LOMA to another ship, Captain Maurer personally reviewed the advisory board's findings, and stated that he concurred in its findings and conclusion, based on plaintiff's performance record.

As for the April 23, 1984 advisory board's findings by a 3–2 vote recommending against a second sea tour for plaintiff, LT Collins contends that the advisory board applied incorrect and inconsistent standards by which she was judged. First, despite the language of OPNAVINST 1412.2C (July 13, 1983), LT Collins claims that the advisory board did not base its decision on her acquired knowledge, nor

assess her performance as a division head. Rather, plaintiff claims the advisory board predicated its decision on a lack of confidence in LT Collins' ability to react under stress or to perform as a department head. Second, because she claims officers with equal weaknesses and deficiencies received OOD and SWO qualification, LT Collins contends that she too should be accorded qualification. Third, LT Collins draws attention to the vote of LT Otto, one of her tutors. According to LT Collins, his vote of confidence, when matched with the panel's overall adverse finding, suggests either that LCDR Otto was a poor instructor or that the panel's judgment was faulty. In either event, LT Collins contends that these implications should invalidate the findings of the board.

With respect to the first two elements of plaintiff's challenge to the April 23, 1984 advisory board, the court has already concluded that they are without merit. As to the third element, the discrepancy in the voting only reflects varied assessments of her abilities. All agreed that LT Collins had weaknesses. It is the extent to which these shortcomings would inhibit her ability to perform the functions of SWO and OOD that the members disagreed.[30] In fact, both officers who gave plaintiff favorable votes, did not recommend according her SWO or OOD qualification, rather, they recommended transferring her to another ship.

As her final contention, LT Collins contends that it was inconsistent for Captain Maurer to convene a board comprised of many of the board members who sat on her November and December OOD and SWO qualification boards. LT Collins contends that, in light of these panelists' "earlier documented" improper biases and conduct, she was, once again, not evaluated fairly.

While it might have been better for Captain Maurer to have convened an entirely

29. On the sexual harassment charge, the BCNR also had before it the advisory opinion of NMPC–61, Director of Equal Opportunity Division, recommending no relief.

30. LCDR Killion, in his summary of the April 23, 1984 Board's findings noted that "both offi-

cers voting for LT Collins did so with reservations—noting her lack of self confidence. They based their votes only upon LT Collins having the potential skills to achieve SWO Qualifications."

new panel, Captain Maurer explained, to the satisfaction of that board, that he lacked the qualified personnel. However, as the final arbitrator in determining whether LT Collins should be transferred, Captain Maurer could have transferred LT Collins, notwithstanding the panel's recommendation. In the instant case, he acted in concurrence with the board's findings.

LT Collins has levied multiple charges against her colleagues and superiors. To a large extent, plaintiff has failed to substantiate these allegations. Even viewing the events in a light most favorable to the plaintiff, this court is persuaded that the BCNR, based on the evidence before it, acted properly when it concluded that LT Collins' failure to obtain SWO or OOD qualification was not the product of improper conduct of Naval personnel and not in violation of any applicable regulation or statute. Rather, LT Collins failed to attain SWO or OOD status, or be promoted, due to her own inadequate performance and her own failure to demonstrate an adequate level of understanding, knowledge and judgment. Plaintiff, therefore, was not entitled to the relief requested in her two filings before the BCNR.

## DUE PROCESS OF THE LAW AND BCNR PROCEEDINGS

As her final objection to the BCNR's course of action, plaintiff claims that she was denied due process under the law by the manner in which the BCNR reviewed her claim. Plaintiff asserts that it was improper for the BCNR not to grant her an opportunity to orally refute the April 24, 1986 advisory recommendation at a hearing. Furthermore, plaintiff contends that it was improper for the BCNR to treat her rebuttal to the advisory recommendation as a motion for reconsideration of the BCNR's recommendation.

No court may treat a constitutional challenge lightly. However, when reviewing such a challenge, the court recognizes that "Due process of law is variable in concept. The procedures required by the due process clause depend upon the particular circumstances involved, the precise nature of the government function and the type of

'liberty' or 'property' interest affected." *Flute v. United States,* 535 F.2d 624, 627, 210 Ct.Cl. 34, 40 (1976).

█ Initially, this court notes that whether or not to hold a hearing is within the board's discretion and that under the governing statutes and regulations the board need not convene a hearing if the board deems a hearing unnecessary. Moreover, a board may order corrections or modifications of a record with or without a hearing. *Id.* 535 F.2d 624, 210 Ct.Cl. at 40–41; *see also Armstrong,* 205 Ct.Cl. at 764; 32 C.F.R. 723 (1986).

█ The BCNR's decision to treat LT Collins' rebuttal to the advisory recommendation as a motion for reconsideration of the BCNR's final recommendation was not a violation of her right to due process. First, LT Collins was on notice of how the BCNR would treat her rebuttal once she received the April 24, 1986 Advisory Opinion. The Advisory Opinion clearly stated that the BCNR's staff could issue a final recommendation prior to the normal 30-day waiting period, if the board determined that her case required expedited proceedings, especially because a selection board was scheduled to commence in the near future, on May 12, 1986. Second, even after adopting the advisory opinion, the BCNR afforded LT Collins the opportunity to challenge its ruling. When the BCNR issued its recommendation on May 9, 1986, the acting executive director of the BCNR informed LT Collins that she had "the privilege to submit new and material evidence for [re]consideration [of the BCNR's adverse recommendation]. However, the burden [was] on [LT Collins] to show that an error or injustice ... occurred."

When the BCNR received plaintiff's rebuttal to the advisory recommendation on May 15, 1986, the BCNR considered the submission as a request for reconsideration. In this way, the BCNR extended to LT Collins a further opportunity to submit to the BCNR "new and material evidence" which might require the BCNR to reconsider her allegations. LT Collins' request, however, was denied by the BCNR when it was determined that she had failed to pro-

vide any new evidence or information in addition to that which the BCNR had already considered. The BCNR's decision to treat the rebuttal as a constructive request for reconsideration was not arbitrary, capricious or violative of LT Collins' due process rights.

Case law does support the proposition that if, collectively, errors in a record support a finding that if proper procedure had been followed, an official would have reached a different result more favorable to the plaintiff, a remand must issue. *Sterlingwear of Boston, Inc. v. United States*, 11 Cl.Ct. 879, 889 (1987). In the instant case, however, the record is replete with sufficient evidence to support the findings made at the administrative level. No remand is required in plaintiff's case and the decisions of the BCNR should be upheld. LT Collins was retired after two failed attempts at promotion in accordance with 10 U.S.C. § 632 (1982). The court should be reluctant to reinstate LT Collins into a military rank she never held and award her classifications for which she never qualified, according to the determination of the military authorities to whom those decisions have been entrusted by the Congress. Moreover, LT Collins has failed to document any demonstrated way in which the board's choice of proceedings improperly influenced the board's recommendations. In sum, the BCNR proceedings did not violate LT Collins' rights to due process.

### CONCLUSION

After a careful review of all the submissions and arguments presented by both parties, the court, hereby, GRANTS the Defendant's Partial Motion to Dismiss and Motion for Summary Judgment and DENIES Plaintiff's Cross–Motion for Summary Judgment. The Clerk of the Court is directed to enter judgment in accordance with this decision.

IT IS SO ORDERED.